## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ZHAOJIN DAVID KE,<br>*Plaintiff* | : <br> : <br> : | CIVIL ACTION |
| **v.** | : <br> : | |
| LIBERTY MUTUAL INSURANCE<br>COMPANY,<br>*Defendant* | : <br> : <br> : | No. 20-1591 |

### MEMORANDUM

PRATTER, J.                                                    NOVEMBER ____, 2021

Not every broken thing is worth the cost to fix it.

After a car accident, Zhaojin Ke filed a claim with Liberty Mutual, his insurer, for repairs to his van. Because the cost of the repairs would have reached the market value of the van itself, if not exceeded the value, Liberty Mutual offered him the van's market value instead. Not content, Mr. Ke demanded that Liberty Mutual pay for the repairs. When it did not, Mr. Ke sued, claiming that Liberty Mutual had tricked him into buying insurance, violated the insurance policy, and handled his claim in bad faith.

No reasonable juror could find that Liberty Mutual did any of those things. Thus, the Court grants Liberty Mutual's motion for summary judgment and denies Mr. Ke's motion for the same. As a predicate to ruling on the dueling summary judgment motions, the Court grants in part Mr. Ke's motion to exclude, that is, to limit the permitted testimony of Liberty Mutual's expert.

### BACKGROUND

Driving through Philadelphia, Mr. Ke was rear-ended on an icy road, causing him to bump into the car in front of him. Doc. No. 48-3 ¶¶ 10–12. His right headlight and right corner of his bumper were damaged. *Id.* ¶ 12. Following Liberty Mutual's instructions, Mr. Ke dropped his car off at a body shop for a repair estimate. *Id.* ¶ 14.

That day, Liberty Mutual's claims adjuster authorized repairs on the van, but quickly backtracked. *Id.* ¶¶ 16, 21. The body shop estimated that repairs would cost at least $3,389.17. Doc. No. 48-3 ¶ 17. Liberty Mutual's appraiser valued the car at $3,725.00. Doc. No. 54-1 ¶ 19. Because the repair estimate was nearly the van's value, Liberty Mutual labeled the van a "total loss." Doc. No. 54-1 ¶ 22. So Liberty Mutual offered Mr. Ke $3,613.04, or the van's cash value ($3,725) plus taxes and fees ($388.04), minus the policy's $500 deductible. Doc. No. 54-1 ¶ 25; Pl.'s Ex. 130.

Mr. Ke disagreed that the van was "totaled," and demanded that Liberty Mutual pay for the repairs. Doc. No. 48-3 ¶ 26. Liberty Mutual explained to Mr. Ke that he could take the higher payout and still keep his van, so long as he got a "salvage title" from the Pennsylvania Department of Motor Vehicles and did not drive his van "until repairs have been completed and the vehicle passes the state safety inspection." Pl.'s Ex. 97, Doc. No. 48-4. Mr. Ke refused, insisting that it was Liberty Mutual's job, not his, to have the van repaired.  Doc. No. 48-3 ¶ 36.

Mr. Ke also demanded a higher payout, claiming he was entitled to $5,000, not just $3,613.04. For support, he produced "a list of similar vans," all "priced higher than $5,000." Doc. No. 48-3 ¶ 38. Liberty Mutual rejected these comparators, as none "were the same year, make, model or market area" of his van, but the insurer's representative told him that the insurer would reconsider if he could produce exact comparators, or "the exact year, make and model … in [his] area." Doc. No. 54-1 ¶¶ 30–31. Mr. Ke produced no exact comparators, so Liberty Mutual stuck to its initial valuation and offer.

Mr. Ke did not accept Liberty Mutual's proffered payout. Instead, he took his vehicle back from the repair shop, but without salvage title. He then sued Liberty Mutual and its claims adjuster in the Pennsylvania Court of Common Pleas. The defendants removed the case to this Court and

2

moved to dismiss. The Court dismissed all claims against the adjuster, but let the claims against Liberty Mutual proceed.

Mr. Ke sues for breach of contract and unjust enrichment. He also accuses Liberty Mutual of handling his claim in bad faith and engaging in unfair trade practices, for which he seeks damages under 42 Pa. Cons. Stat. § 8371 and Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201-1 *et seq*. The parties filed cross-motions for summary judgment on all claims. Also, Mr. Ke moves to exclude the expert report of Kevin M. Quinley, Liberty Mutual's expert in "insurance handling."

## LEGAL STANDARDS

To aid their case, parties may introduce expert testimony, so long as the expert is qualified and his testimony is "relevant" and "reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). In particular, the expert's "scientific, technical, or other specialized knowledge" must be of a type that is expected to help the jury "understand the evidence." Fed. R. Evid. 702(a). And his testimony must not only be "based on sufficient facts" and "reliable principles and methods," but must have also "reliably applied the principles and methods to the facts of the case." *Id.* 702(b)–(d). The party offering the expert bears the burden of proof, and must show admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

To win summary judgment before trial, the moving party must show that there is no "genuine" dispute of "material" facts and that it wins "as a matter of law." Fed. R. Civ. P. 56(a). That is, the moving party must prove that no "reasonable jury could return a verdict" for the other side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court draws all inferences in favor of the non-moving party. *Id.* at 255. Still, the non-moving party cannot rest on "mere allegation[s]" but instead "must set forth specific facts" to support his claims. *Id.* at 256. And not

just any facts will do; the evidence must be in the record, "probative," and relevant, such that "under the governing law," the fact "might affect the outcome of the suit." *Id.* at 248–49.

DISCUSSION

I.     **Liberty Mutual's expert may testify to industry practices but not opine on bad faith**

To show that it handled Mr. Ke's claim in good faith, Liberty Mutual offers an expert report from Kevin M. Quinley, an expert in insurance claims who presumably would testify along the same lines as his report, namely that Liberty Mutual handled Mr. Ke's claim in line "with … industry norms, customs, and practices." Pl.'s Ex. 160, Doc. No. 47-2. Mr. Ke moves to exclude this report. He does not contest that Mr. Quinley is qualified, given that Mr. Quinley has over 40 years of experience in insurance claims and so has "specialized knowledge." Pl.'s Ex. 156, Doc. No. 47-2; Fed. R. Evid. 702(a). Yet Mr. Ke does object that Mr. Quinley's testimony is unreliable and irrelevant.

**A. Mr. Quinley's testimony is reliable**

In forming his opinion, Mr. Quinley used what he describes as a qualitative methodology: he compared Liberty Mutual's actions here to what he has seen happen with other insurance claims over the past four decades to decide if Liberty Mutual followed industry standards. Mr. Ke objects that this is not a "scientific methodology." Doc. No. 47-1 at 2, 25. To be sure, as Mr. Ke notes, Mr. Quinley's methodology has no testable hypothesis or known error rate. *See In re Paoli R.R. Yard PCB Lit.*, 35 F.3d 717, 742 & n.8 (3d Cir. 1994). But experts need not be scientists or mathematicians. The Rules of Evidence permit experts with "scientific, technical, *or other specialized knowledge.*" Fed. R. Evid. 702(a); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("[T]here are many different kinds of experts, and many different kinds of expertise."). For experts like this, "whose expertise is based purely on experience," not experiments or tests,

4

courts focus on two factors: (1) Is the methodology commonly used? (2) Is the opinion is based on sufficient "professional studies or personal experience"? *Kumho Tire Co.*, 526 U.S. at 151–52.

Mr. Quinley's methodology is how experts typically testify about industry customs and practices. *See, e.g., Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 217–18 (3d Cir. 2006); *United States v. Leo*, 941 F.2d 181, 196–97 (3d Cir. 1991). Drawing on their "specialized observations," they compare and contrast industry practices to the facts before them. *Kumho Tire*, 526 U.S. at 149.

In addition, Mr. Quinley relied on his 40-plus years of "actual insurance industry experience" in forming his opinion that Liberty Mutual followed "industry standards." *Mirarchi v. Seneca Specialty Ins. Co.*, 2013 WL 1187065, at *6 (E.D. Pa. Mar. 22, 2013); *see Berckeley Inv. Grp.*, 455 F.3d at 218 (permitting "experienced former counsel for the SEC with expertise in offshore securities transactions" to testify as to "[t]he customs and business practices in the securities industry"). Thus, his testimony on that issue is reliable.

Fighting this conclusion, Mr. Ke objects that the expert report was not peer-reviewed. Though the Rules of Evidence favor scientific or technical expert reports that rest on a "*technique or theory* [that] has been subject to peer review and publication," the Rules do not require that the report *itself* be peer reviewed. Fed. R. Evid. 702 note; *see In re Paoli R.R. Yard*, 35 F.3d at 758. In other words, Mr. Quinley did not have to have another insurance expert check his report for it to be reliable.

## B.  Mr. Quinley's testimony is relevant

Next, Mr. Ke insists that Mr. Quinley's opinion is "largely irrelevant" because it does not resolve all the claims in the case. Doc. No. 47-1, at 26. But expert testimony need not decide the entire case or even an entire issue out of many to be admissible. Expert testimony is relevant if it

provides a mere stepping stone for the jury's decision on *an* issue. *See* Fed. R. Evid. 401. Mr. Quinley's report does just that. He opines that Liberty Mutual followed industry practice in handling Mr. Ke's claim. And following industry standards can be evidence that an insurer acted in good faith, and vice versa. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004); *see Pa. Nat'l Mut. Cas. Ins. Co. v. Johnson*, 82 Pa. D. & C. 4th 23, 45 (Pa. Ct. C.P. 2007) (finding that insurer acted in bad faith, in part, because it acted "in violation of the standards of the insurance industry").

### C. Mr. Quinley may not provide legal opinions

Because Mr. Quinley is qualified and his testimony on the issue is reliable and relevant, the Court will allow his opinion that Liberty Mutual followed industry practices in handling Mr. Ke's claim. But the Court excludes other portions of Mr. Quinley's report, for they are legal conclusions that will not "help the [jury] understand the evidence." Fed. R. Evid. 702(a).

In particular, the Court will not admit his opinions on how the insurance contract should be interpreted. *See, e.g.*, Pl.'s Ex. 148–150. Nor will the Court admit his opinions that Liberty Mutual acted in good faith. For instance, Mr. Quinley opines that Liberty Mutual "conducted a reasonable claim investigation" and that it "reasonably and promptly communicated with" Mr. Ke. Pl.'s Ex. 147, 150. These are legal opinions. Though experts can testify to the "ultimate [factual] issues to be decided by the trier of fact," they cannot "render[ ] a legal opinion" as to "whether [a defendant] complied with [its] legal duties." *Berckeley Inv. Grp.*, 455 F.3d at 217–18. Not only are such legal opinions not helpful, but they impermissibly usurp the roles of the Court and the jury. Fed. R. Evid. 702(a); 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 704.04 (2021). Thus, the Court grants Mr. Ke's *Daubert* motion in part and denies it in part.

### D. Mr. Quinley did not have to list his total compensation in the report

Finally, Mr. Ke claims that the Court should throw out the entire Quinley report because Mr. Quinley failed to submit "a statement of the compensation [he was] paid." Fed. R. Civ. P. 26(a)(2)(B)(vi). Yet Mr. Quinley explained in his report that he charges $375 an hour to prepare the report and $425 an hour to testify. Pl.'s Ex. 158; *see Durr Sys., Inc. v. ECF Sys. Inc.*, 2021 WL 351175, at *10 (D. Md. Feb. 2, 2021). His hourly rates are enough "to permit full inquiry into" any "potential ... bias" from compensation, especially because Mr. Ke could have deposed Mr. Quinley and asked him additional questions about his compensation. Advisory Committee's Note to the 2010 Amendments to Fed. R. Civ. P. 26; *see Sherwin-Williams Co. v. PPG Indus., Inc.*, No. 2:17-cv-1023 2019 WL 2501471, at *5 (W.D. Pa. Mar. 19, 2019). So the Court will not refuse to consider Mr. Quinley's opinions on that ground.

## II.   Liberty Mutual is entitled to summary judgment on all claims

Both sides move for summary judgment, asserting that no reasonable juror could rule for the other. Because Mr. Ke represents himself, the Court indeed reads his submissions generously. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But that does not relieve Mr. Ke of his burden to point to "sufficient evidence favoring" him. *Anderson*, 477 U.S. at 249. Because Mr. Ke has not carried his burden, and Liberty Mutual has, the Court grants Liberty Mutual's motion for summary judgment.

### A. No reasonable juror could find that Liberty Mutual breached its contract

Parties are bound by the written terms of their insurance policy. *401 Fourth St., Inc. v. Invs. Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005). If those terms are "clear and unambiguous," the Court gives them their plain meaning. *Id.* Mr. Ke purchased collision insurance. To him, that means that Liberty Mutual must pay to repair his vehicle, no matter the cost. But that is not what his policy says, or ever said.

Per the policy, Liberty Mutual had the option to pay the "actual cash value" of the van or "the amount necessary to repair or replace" it. Pl.'s Ex. 57. In other words, Liberty Mutual does not have to pay for the repairs if it will cost the same or more than the vehicle is worth. The van was worth $3,725.00. In comparison, the repairs were valued at $3,389.17. But that was just a "preliminary estimate based on visible damage." Pl.'s Ex. 40. Once the van was "taken apart," the mechanics might find "additional damage" requiring "additional repairs." *Id.* After all, Mr. Ke's car was almost 14 years old. Mr. Ke even recognized that the initial quote likely would not cover all the necessary repairs. *See* Pl.'s Ex. 62 ("[T]he body shop would charge initially $3,389.17, with additional charges later on."). By offering Mr. Ke the value of his van rather than repairing it, Liberty Mutual did not breach the contract.

To try to get around this plain language, Mr. Ke points to an advertisement from Liberty Mutual explaining that "Collision Insurance is an add-on coverage that pays the cost of repairing or replacing [a vehicle], minus the amount of [the] deductible." Pl.'s Ex. 46. But this advertisement from Liberty Mutual's website is not itself a part of the insurance contract. Instead, it is "an invitation to [Mr. Ke] to ... purchase" this additional coverage. *Touraine Partners v. Kelly*, 482 A.2d 240, 246 (Pa. Super. Ct. 1984). Even if it had been part of the contract, Liberty Mutual would have adhered to the terms of the advertisement. The advertisement promised to pay for "the cost of repairing *or* replacing" his van. Pl.'s Ex. 46 (emphasis added). Liberty Mutual chose to replace, not repair.

Mr. Ke also points to another advertisement, for "Better Car Replacement," stating that if his van "is totaled," Liberty Mutual will "give [him] the money for a car that's one model year newer with 15,000 fewer miles on it." Pl.'s Ex. 15. But Mr. Ke has provided no proof that he purchased this "additional optional coverage[ ]." Pl.'s Ex. 15. His policy shows that he did not. *See*

Pl.'s Ex. 13–16. Thus, that term is not part of his policy. *DeJesus v. Liberty Mut. Ins. Co.*, 223 A.2d 849, 850 (Pa. 1966).

Despite the policy's plain language, Mr. Ke insists that the sales agent promised otherwise. In Pennsylvania, insurers cannot promise one thing and then issue a policy that says another. *Collister v. Nationwide Life Ins. Co.*, 388 A.2d 1346, 1353 (Pa. 1978). If an insurer "creates in the insured a *reasonable* expectation of coverage," that expectation, not the policy's language, controls. *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1311 (3d Cir. 1994) (emphasis added). Mr. Ke asserts that Liberty Mutual's sales agent promised him on the phone that Liberty Mutual would provide "full insurance." Pl.'s Ex. 195, 209. But promising "full insurance" is, at most, a promise to put Mr. Ke in a situation comparable to where he was before the accident. It is not a promise to pay for repairs, no matter the cost. No reasonable juror could find that Mr. Ke *reasonably* expected for Liberty Mutual to pay for repairs free of terms, conditions or exclusions—especially when his insurance contract contained plenty. *See ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 576 F. Supp. 936, 942 n.12 (E.D. Pa. 1983) ("'Full coverage' is subject, of course, to policy limits and deductible provisions."), *aff'd on this ground*, 764 F.2d 968, 973–74 (3d Cir. 1985).

Liberty Mutual complied with the contract by offering to replace Mr. Ke's van. No reasonable juror could find that Mr. Ke reasonably expected otherwise. Thus, the Court grants Liberty Mutual summary judgment on this claim.

### B. Mr. Ke cannot sustain a claim for unjust enrichment

Next, Mr. Ke claims that that Liberty Mutual got a benefit from him, his premium, that it kept unfairly when it refused to repair his van. But unjust enrichment can occur only when parties exchanged a benefit *outside of* a contract. *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254

(Pa. 2006). Here, Mr. Ke admits that he paid Liberty Mutual his monthly premiums under a valid insurance contract. Doc. No. 48-3 ¶ 6. Thus, his unjust-enrichment claim fails as a matter of law.

### C. No reasonable juror could find that Liberty Mutual engaged in unfair trade practices

Mr. Ke also seeks to recover damages under the Unfair Trade Practices and Consumer Protection Law, claiming that Liberty Mutual engaged in "fraudulent or deceptive conduct which create[d] a likelihood of confusion or of misunderstanding." 73 Pa. Stat. § 201-2(4)(xxi). To prove fraudulent misconduct, Mr. Ke must show that Liberty Mutual's sales agent made a material misrepresentation, knowing that it was false, in order to mislead Mr. Ke and that Mr. Ke justifiably relied on that misrepresentation. *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999). According to Mr. Ke, Liberty Mutual's sales agent fraudulently induced him to switch to Liberty Mutual by promising him "full insurance" and a "good repair" in case of a collision, a promise, he claims, the sales agent knew was untrue because Liberty Mutual later decided to replace his car rather than repair it. Pl.'s Ex. 186.

Mr. Ke has little proof of this supposed promise, aside from his own assertions. Nothing in the written insurance quote mentions "full coverage" or a "good repair." *See* Pl.'s Ex. 1–7. Mr. Ke says he would have more proof if Liberty Mutual had not deleted the sales agent's emails. The sales agent left Liberty Mutual in March 2018, and, following company policy, Liberty Mutual deleted the agents' emails and documents.[1]

Even assuming that the sales agent did promise something that Mr. Ke may have reasonably interpreted as "full coverage" and a "good repair," Mr. Ke has not shown that any such

---

[1] Mr. Ke claims that Liberty Mutual should have kept these emails to prepare for this litigation. That would have required quite a bit of foresight, given that Mr. Ke did not file this suit until almost two years after the agent left Liberty Mutual. Moreover, Mr. Ke does not explain why he does not have copies of this additional email correspondence between him and the sales agent, if it exists.

promise was "false." *Bortz*, 729 A.2d at 560. Fairly read, "full coverage" and a "good repair" are mere "overstatement[s] expressed in broad, vague, and commendatory language"—the type of "common marketplace puffery" that reasonable customers cannot be expected to trust. *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993). Even if taken at face value, "full coverage" and a "good repair" mean, at most, that Liberty Mutual will cover all of the damage, minus the deductible and subject to standard terms and conditions, in the event of a collision; they are not promises to repair a van, no matter the cost, rather than replace it.

Moreover, Mr. Ke has produced no proof that the sales agent *knew* his promise was false or intended to mislead Mr. Ke. *Bortz*, 729 A.2d at 560. Mr. Ke never deposed the sales agent, so he never probed the sales agent's knowledge and intent. *See Anderson*, 477 U.S. at 257 ("[T]he plaintiff must present affirmative evidence ... even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery.").

Because Mr. Ke has not pointed to evidence in the record to show fraudulent conduct, the Court grants Liberty Mutual summary judgment on this claim.

### D. No reasonable juror could find that Liberty Mutual acted in bad faith

Insurers may not "act[] in bad faith" towards the insured. 42 Pa. Cons. Stat. § 8371. For example, insurers cannot refuse to pay out a claim for "frivolous" reasons, or no reason at all. *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999). They cannot deny a claim without sufficient investigation. *Id.* Nor can they fail "to communicate with the insured." *Id.* Mr. Ke accuses Liberty Mutual of handling his claim in bad faith. But, again, no reasonable juror could find that it did.

### i.    Liberty Mutual did not need to investigate the accident further

First, Mr. Ke blames Liberty Mutual for not investigating the accident more thoroughly. But Liberty Mutual did not need to, for it planned to compensate Mr. Ke for the damage to his car, no matter who caused the accident. That is how collision insurance works. *See* Pl.'s Ex. 55 ("We will pay for direct and accidental loss to 'your covered auto' … [from its] impact with another vehicle or object.").

### ii.    Liberty Mutual did not have to pay for repairs, rather than a replacement

Next, Mr. Ke faults Liberty Mutual for refusing to pay for repairs. To prove that Liberty Mutual acted in bad faith in failing to pay a claim, Mr. Ke must show "by clear and convincing evidence" that Liberty Mutual lacked a "reasonable basis" to deny him the repairs and that it "knew" that it had no reasonable basis to do so. *Rancosky v. Wash. Nat'l Ins. Co.*, 170 A.3d 364, 377 (Pa. 2017).

To start, Mr. Ke claims that Liberty Mutual had no reasonable basis to offer him the value of his van, rather than the cost of repairs, because his van was not "totaled"; he could still drive it. But, under his insurance policy and Pennsylvania law, his van *was* totaled. In Pennsylvania, a vehicle is an *economic* "total loss" if it costs more to repair it than the vehicle is worth. *Berg v. Nationwide Mut. Ins. Co.*, 235 A.3d 1223, 1247 (Pa. 2020) (citing 31 Pa. Code § 62.3(e)). His van was valued at $3,725.00; the repairs were estimated at $3,389.17, and likely to be even higher. Because the "cost of repairing" the van equals or "exceeds its appraised value less [its] salvage value," or the price for which the damaged van could be sold, the van was a total economic loss. 31 Pa. Code § 62.3(e).

Mr. Ke also claims that Liberty Mutual unreasonably undervalued his van. To him, the van was worth at least $5,000. But Mr. Ke does not actually present an appraisal of his own to back up

that number. Instead, he simply attacks Liberty Mutual's appraisal, accusing it of crafting a self-serving report. But Liberty Mutual followed all the right steps. For the appraisal, Liberty Mutual's claims adjuster input Mr. Ke's information into CCC Information Services, "a software … used by insurance companies and repair shops … to generate reports and calculate costs." Doc. No. 48-3 ¶ 19. CCC, like other "guide source method" providers, calculates the "retail book value of a vehicle of like kind and condition." 31 Pa. Code § 62.3(e)(1)(i). CCC is, and was at the time of Mr. Ke's claim, an approved appraiser. 47 Pa. B. 1254 (Feb. 25, 2017). Thus, Liberty Mutual reasonably relied on its valuation in refusing to make or pay for repairs.

For these reasons, no reasonable juror could find that Liberty Mutual lacked a "reasonable basis" to offer Mr. Ke the value of his van, rather than pay the cost to repair it. *Rancosky*, 170 A.3d at 377.

### iii.   Liberty Mutual did not arbitrarily refuse to accept quotes for different vans

In addition, Mr. Ke accuses Liberty Mutual of "arbitrarily refusing to accept evidence" of his van's value. Doc. No. 48, at 17; *see Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (Pa. 2004).

To support its valuation, Liberty Mutual produced two comparators; both were 2004 Honda Odyssey's, located near Philadelphia. Mr. Ke complains that these vans had much higher mileage than his—106,527 and 149,100 miles compared to his 75,000 miles. Pl.'s Ex. 78. But the appraisal for his van takes into account the comparator's mileage in deciding its value. *See* Pl.'s Ex. 78 ("Adjusted Comparable Value represents the price of the comparable vehicle with adjustments for options, mileage, condition, and year/model/trim as compared to the loss vehicle.").

Offering him a chance to contest its appraisal, Liberty Mutual told Mr. Ke that if he "wish[ed] to dispute the value," he could present comparators "that are the exact year, make, and

model as [his] vehicle … in [the Philadelphia] market area." Pl.'s Ex. 97. Mr. Ke produced other vehicles, but none were proper comparators to his 2004 Honda Odyssey. Almost all were different years or models. Pl.'s Ex. 108, 111, 113, 116, 122, 125. The sole one he found with the same year, make, and model was in Washington, an entirely different market area. Pl.'s Ex. 119.

Mr. Ke faults Liberty Mutual for rejecting these comparators, insisting that the insurer acted arbitrarily. But Liberty Mutual had "sufficient reason" to do so. *Arbitrarily*, *Oxford English Dictionary* (2d ed. 1989). By regulation, Liberty Mutual's appraisal had to be based on vehicles "of like kind" and in the same "locality." 31 Pa. Code. § 62.3(e)(1)(i), (6). Thus, Liberty Mutual did not arbitrarily refuse Mr. Ke's non-exact comparators.

### iv.    Liberty Mutual sufficiently communicated with Mr. Ke

Mr. Ke also complains that Liberty Mutual failed to communicate with him. Actually, Liberty Mutual kept in regular contact.

The day of the accident, Mr. Ke called Liberty Mutual. Immediately, it told him to drive the van to the body shop. Doc. No. 48-3 ¶ 14. It also booked him and paid for a rental car. Pl.'s Ex. 34–35. When the repair estimate came in, two days later, the adjuster left a voicemail with Mr. Ke, explaining that the vehicle had been calculated to be a total loss. Doc. No. 48-3 ¶ 17; Pl.'s Ex. 31. Three days later, the adjuster called Mr. Ke and again explained to him why his vehicle was considered totaled. *Id.* ¶ 25. Over the next few days, Mr. Ke continued to insist that Liberty Mutual pay for repairs. Pl.'s Ex. 91–97. The adjuster explained that Liberty Mutual would pay for the van's value and attached the market report showing that value. Pl.'s Ex. 97. For the next week, the adjuster continued to answer Mr. Ke's questions and provide documentation for his valuation. Pl.'s Ex. 91–94. Mr. Ke continued to refuse Liberty Mutual's offer, and then stated that he planned to sue. Pl.'s Ex. 91. At that point, Liberty Mutual had no further contact with him.

Based on these undisputed facts, no reasonable juror could find that Liberty Mutual failed to communicate with Mr. Ke. It immediately responded to his claim and provided him a settlement offer within days—far sooner than the regulations require. *See* 31 Pa. Code § 146.5(a) (10 days to acknowledge claim); § 146.6 (30 days to investigate claim); § 146.7(a)(1) (15 days to accept or deny claim). And Liberty Mutual always responded to Mr. Ke's follow-up questions within a few business days. *See* 31 Pa. Code § 146.5(c) (insurer should respond to "communications from a claimant" within 10 business days). Plus, Liberty Mutual thoroughly explained its decision; it told him that the repairs would cost more than the van was worth, and provided him with the CCC report to prove his van's value. *Grossi v. Travelers Personal Ins. Co.*, 79 A.3d 1141, 1154 (Pa. Super. Ct. 2013).

Still, Mr. Ke argues, Liberty Mutual should not have stopped trying to settle with him after he rejected its final offer and invoked "the 'S' word." Liberty Mutual did not have to continue to negotiate with him after he told the claims adjuster that he was done negotiating: "It looks like I will have to sue your company … . Obviously, a peaceful negotiation will never work." Pl.'s Ex. 91.

### v.    Liberty Mutual did not negotiate in bad faith

Finally, Mr. Ke accuses Liberty Mutual of negotiating a settlement in bad faith. To hear Mr. Ke tell it, Liberty Mutual tried to bully him into a lower settlement by offering him too little money at first and then threatening to keep his van. But the evidence he produces shows otherwise.

Mr. Ke says that the claims adjuster offered him a mere $2,500 on the phone. Pl.'s Ex. 192–93. Liberty Mutual says otherwise, insisting that the claims adjuster offered to pay him $3,613.04. Doc. No. 54-1 ¶ 25. Notably, in a letter to the Pennsylvania Insurance Department, sent shortly after the accident, Mr. Ke said that the claims adjuster offered "to pay [him] about $3,000." Pl.'s Ex. 127.

But even if the claims adjuster did initially offer Mr. Ke $2,500 on the phone, that, by itself, is not enough for a reasonable juror to find bad faith. For one, the adjuster followed up with an offer in writing for $3,613.04. Pl.'s Ex. 97. Plus, Mr. Ke has produced no evidence to show that the initial $2,500 offer was intended to pressure him into taking less for his claim, rather than the claims adjuster misspeaking on the phone. Mr. Ke could have deposed the claims adjuster to discern his intent, but he did not.

Besides, even if the claims adjuster did offer the $2,500 on purpose, making a slightly lower initial offer as the "starting point for negotiation" is "not necessarily" bad faith. *Hollingsworth v. State Farm Fire & Cas. Co.*, 2005 WL 563414, at *8 (E.D. Pa. Mar. 9, 2005); *Williams v. Hartford Cas. Ins. Co.*, 83 F. Supp. 2d 567, 576 (E.D. Pa. 2000); *see Thomer v. Allstate Ins. Co.*, 790 F. Supp. 2d 360, 376 (E.D. Pa. 2011) (initial offer of $30,000 for claim valued at $35,000 to $45,000 not bad faith).

Mr. Ke also claims that Liberty Mutual insisted on taking his van and falsely told him he could not drive it. But his evidence shows just the opposite. Once Mr. Ke said that he wanted to keep his van, Liberty Mutual told him that he could do so "and still receive a payout"—the entire $3,613.04—but he "would need to get a salvage title from Pennsylvania DMV on the van and provide [Liberty Mutual] with a copy." Pl.'s Ex. 97; *accord* Pl.'s Ex 141. Post-accident, if a vehicle is a total economic loss, the owner can either hand the "salvage vehicle" over to the insurer or he can keep it. 75 Pa. Code §§ 102, 1161(b). If he chooses to keep it, he must apply to the DMV for a salvage certification "immediately." 75 Pa. Code § 1161(b). Before issuing this certificate, the DMV will conduct an inspection to make sure that the car has been repaired and is safe to drive. Thus, no reasonable juror could find that Liberty Mutual acted in bad faith by telling him that he needed a salvage title to continue to drive his van; the regulations required it.

Finally, Mr. Ke complains that Liberty Mutual has still not paid him anything, not even "a single dollar." Pl.'s Br. 19. But because Mr. Ke decided to keep his van, Liberty Mutual *could not* pay him until he gets a certificate of salvage. *See* 75 Pa. Code § 1161(b) ("If an owner retains possession of a vehicle which is damaged to the extent that it qualifies for vehicle replacement payment, … an insurer shall not pay vehicle replacement value until the owner produces evidence to the insurer that the certificate of salvage has been issued."). As Mr. Ke openly admits, he never applied for the certificate of salvage. Pl.'s Ex. 273. Liberty Mutual did not act in bad faith by following the rules.

## CONCLUSION

Neither the insurance policy nor good faith required Liberty Mutual to arrange for the repair of Mr. Ke's van, rather than pay him the van's value. Thus, the Court grants Liberty Mutual's motion for summary judgment, after granting Mr. Ke's *Daubert* motion in part. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

17